**MILWAUKEE SANITARIUM, a Wisconsin corporation, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 59–C–92.**

United States District Court
E. D. Wisconsin.

Jan. 31, 1961.

Marvin Klitsner, Foley, Sammond & Lardner, Milwaukee, Wis., for plaintiff.

William Kolbe, Dept. of Justice, Tax Division, Washington, D. C., Edward G. Minor, U. S. Atty., Milwaukee, Wis., for defendant.

TEHAN, Chief Judge.

The plaintiff, Milwaukee Sanitarium, a Wisconsin corporation, with its principal place of business in the City of Wauwatosa, Milwaukee County, Wisconsin, brings this action pursuant to § 1346(a) (1), Title 28 U.S.C., to collect income taxes alleged to have been erroneously retained and withheld for the years 1952, 1953 and 1954. After a partial stipulation of facts had been filed, a trial by the court was held. The court has considered the stipulations of facts filed.

the testimony and exhibits presented, the briefs filed and the entire record herein, and is prepared to render its decision.

Until November 30, 1954, the plaintiff was engaged in the business of operating for profit a private hospital for the treatment of nervous and mental ailments, and had been so engaged for a period of approximately seventy years. In the operation of that hospital, it owned and used certain land, buildings and equipment, herein referred to as operating assets, which had been purchased by it at a total cost of $1,644,345.47, which amount was the basis of those operating assets as defined by § 1012 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 1012. All of those operating assets, excepting land, were subject to the allowance for depreciation as provided by § 167 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 167. The amount of depreciation against them allowed or allowable as a deduction under said section and similar provisions of prior income tax laws as of November 30, 1954, was $917,342.26, which amount is an adjustment to basis of the operating assets under § 1016(a) (2) of the Internal Revenue Code of 1954, 26 U.S.C.A. § 1016(a) (2).[1] As of November 30, 1954, the adjusted basis for determining loss under § 1011 at the Internal Revenue Code of 1954, 26 U.S.C.A. § 1011, for the operating assets was $727,003.21.

On November 30, 1954, the plaintiff sold its operating assets, together with other property not here relevant to the Ada P. Kradwell Memorial Foundation, herein called the Foundation. The plaintiff received as the sale price for the operating assets the sum of $385,000, which amount was the sole consideration received for such sale. The parties have stipulated that the loss, if any, by reason of such sale was not compensated for by insurance or otherwise, and was sus-

tained during the plaintiff's taxable year ending December 31, 1954. In its income tax return for the year 1954, the plaintiff claimed a deduction for the loss incurred by reason of the sale of its operating assets to the Foundation for a consideration of less than the adjusted basis thereof. Because its deductions for that year, including the deduction for loss incurred on the sale, exceeded the income reported for that year, resulting in a net operating loss, the plaintiff filed refund claims for taxes paid in 1952 and 1953 under § 172(b) of the Internal Revenue Code of 1954, 26 U.S.C.A. § 172(b). The deduction claimed in 1954 for loss incurred by reason of the sale was disallowed, and the plaintiff paid the deficiency assessed plus interest, and filed a claim for refund for that year. The claims for refund, all timely filed, for the years 1952, 1953 and 1954, were disallowed.[2]

■ We are here asked to determine whether the transaction in 1954 whereby the operating assets of the plaintiff were transferred to the Foundation for a consideration less than the plaintiff's adjusted basis for those assets resulted in a deductible loss to the plaintiff. A deductible loss admittedly was sustained if that transaction is held to be a sale from the plaintiff to the Foundation. It is the position of the defendant, however, that that transaction, although in form a sale, was in reality partially a sale and partially a gift, and that the true nature of the transaction is ascertainable from an examination first, of the relationship between the parties thereto and, second, of the price realized through the transaction as compared to the fair market value of the operating assets. After considering the relevant facts, we have concluded that the transaction was, in fact, a sale by the plaintiff to the Foundation of its operating assets, and that the loss sus-

---

1. The parties have stipulated that no other provision of § 1016 is applicable.

2. The parties have stipulated to all of the facts relating to filing by the plaintiff

of income tax returns for those years, payment of taxes for those years, and filing of claims for refund.

tained by the plaintiff by reason of the fact that the price realized on the sale of those operating assets was less than the adjusted basis thereof is a deductible loss sustained during the year 1954. There is no dispute concerning the right of the plaintiff to a refund of taxes for the years 1953 and 1952 if the court holds that a deductible loss was sustained in 1954.

An examination of the facts reveals that there were compelling business reasons for the sale of plaintiff's operating assets in 1954. Mrs. Sophie Schroeder, President of the plaintiff at that time and presently, who was familiar with the operations of the plaintiff for many years prior to the sale, and Everett Smith, a member of plaintiff's Board of Directors, testified that the plaintiff, which enjoyed an excellent reputation in its field, was beset by many problems which had begun to affect its operations as early as 1942. At that time its medical director, Dr. Sleyster, who had been with the plaintiff some 22 years, and who was highly regarded in his field, died. Thereafter, the plaintiff experienced difficulty in attracting a competent replacement, and maintaining a "top-notch" staff. This was due in certain wise to the plaintiff's lack of affiliation with an educational institution at a time when prospective staff members were interested only in positions which afforded them an opportunity to teach in universities. It was also due in part to increasing competition from general hospitals, which were beginning to set up psychiatric departments in order to be eligible for grants of Federal funds. This added competition affected the volume and earnings of the plaintiff's business, as of course did the increasing cost of operations and maintenance. Then too, no small factor, the whole concept of diagnosis and treatment of psychiatric problems changed a great deal after the war,

lessening the need for the custodial type of treatment offered by the plaintiff.

After consideration of all the factors, which the plaintiff's Board of Directors had been aware of for some time, the Board adopted a resolution, on October 11, 1954, recommending adoption by the shareholders of a "Plan of Dissolution and Liquidation of The Milwaukee Sanitarium, a Wisconsin Corporation." The plan contemplated dissolution and complete liquidation of the plaintiff, conversion of its property into cash, a sale of its operating facilities including land, buildings, furniture, equipment and inventory of food, fuel and supplies, to the Foundation for a price of not less than $425,000, and distribution to the shareholders, who were expected to receive a minimum of $250 a share. The plan was presented to the Board by one of its members. The record does not disclose the circumstances leading up to the presentation of the plan, other than a general concern of the Board over the future of the plaintiff's operation, but it would appear that some negotiation with the Foundation had been had prior to its presentation to the Board. Neither is it disclosed with certainty how the sales price was arrived at, although it appears that the selling price of the plaintiff's stock was a major consideration in establishing that figure. The plaintiff made no attempt, through advertising or otherwise, to sell to anyone other than the Foundation.

On or about October 13, 1954, the plaintiff mailed a letter from its President to its stockholders, informing them of the possibility of selling its assets to the Foundation and of liquidating on a basis which would assure a return to the stockholders of at least $250 a share,[3] approximately $50 more than the highest transaction in that stock since 1950. The letter informed stockholders of the difficulties facing the plaintiff in its future operation, and indicated that a purpose

---

**3.** The amount to be distributed was not limited solely to the proceeds realized on the sale to the Foundation.

of the sale would be to place the Sanitarium on a non-profit charitable basis without prejudice to the investment of stockholders. The Foundation is a non-profit charitable organization. The letter further informed stockholders that the sale price of the operating assets would be less than the book value thereof, and stated that a loss might be claimed for income tax purposes. The proposed sale was recommended in the letter. Enclosed with the letter was a notice of a special meeting of stockholders to consider the plan of liquidation and distribution to be held November 15, 1954, together with a copy of the plan attached, and a proxy.

On or about November 5, 1954, the plaintiff received a written offer from the Foundation for the purchase of certain assets including its operating assets, and on November 15, 1954, at the special meeting, the plaintiff's stockholders adopted the plan and approved the sale by appropriate resolutions without dissent. That same day, the Board of Directors approved the sale by appropriate resolution. The sale was consummated on November 30, 1954.

The defendant contends that the plaintiff is not entitled to deduct any loss resulting from that sale because the sale was to a "favorite buyer" at a price less than the adjusted basis of the property sold when, at the time of the sale, the fair market value of the property was either equal to or more than its adjusted basis. With that position we cannot agree, since we do not believe that the facts herein warrant the conclusion either that the Foundation was a "favorite buyer" or that the $385,000 received by the plaintiff from the Foundation was less than the fair market value of the plaintiff's operating assets.

It is true that at the time of the sale there was a connection existing between Milwaukee Sanitarium and the Ada P. Kradwell Memorial Foundation in the person of Dr. William T. Kradwell, the plaintiff's Vice-President and a member of its staff, who was the founder and President of the Foundation. A further connection appears to be Sophie Schroeder, who was both President and Treasurer of the plaintiff, and Vice-President and Treasurer of the Foundation. It is also true that the Secretaries of each were members of the same law firm, and that there were three board members in common.[4] As against this, however, it appears that of the total of 3,695 shares of the plaintiff's stock outstanding and held by 91 stockholders, only 1,403 shares were held by the nine stockholders who had any interest in the Foundation. At the stockholders' meeting of November 15, 1954, at which 3,524 shares of stock were represented, the resolutions adopting the plan of liquidation and dissolution of the plaintiff and approving the sale to the Foundation were unanimously adopted. There is nothing in the record to indicate that those persons having dual interests used their positions to mislead or unfairly influence those stockholders having no interest in the Foundation, nor do we understand the Government to claim or even suggest such a course of conduct. The letter to the stockholders concerning the proposed sale pointed out that the sales price of the operating assets was less than book value, but recited at some length the factors which led the officers and directors of the plaintiff to recommend the sale to the Foundation as being in the best interests of the stockholders. These factors appeared upon the trial and have been accepted by the court as verities. Under these circumstances, there is no warrant for any other finding than to hold that the majority of the stockholders believed that their own economic best interests would be served by the proposed sale and liquidation. Conversely, we hold that there is no evidence whatsoever, that the majority or any of the stockholders intended a partial gift.

The defendant also points to the fact that no buyers were contacted or sought

4. The plaintiff's Board of Directors had seven members, and the Foundation's ten members.

other than the Foundation as indicating that the sale was other than an arms-length transaction. The plaintiff offers justification for its failure to contact other buyers by showing what it believed to be the hazards inherent in that course. The plaintiff's Board of Directors believed that if it became publicly known, or known within the medical profession, that liquidation of the plaintiff was imminent, a reasonable possibility existed that the plaintiff's business would suffer, since referrals of patients would be lessened and the plaintiff's personnel would leave, and since it was impossible to estimate both the length of time which would elapse before another buyer could be found and the loss of income which would be sustained by the plaintiff during that time. We are satisfied that the Board of Directors acted in complete good faith in handling this very delicate transaction of sale of a unique property.

The defendant relies on the testimony of two witnesses, both real estate brokers and appraisers, as proof that the sale price of $385,000 was less than the fair market value of the plaintiff's operating assets at the time of the sale. One of those witnesses, Herman W. Pfeil, testified that in his opinion the fair market value of the plaintiff's land and buildings at that time was $732,000, and the other, Peter A. Berres, believed the fair market value at that time to have been $710,000. Both agreed that the "highest and best use" of the plaintiff's real estate was for institutional purposes.

It is undisputed that in the operation of its hospital the plaintiff owned and utilized a unique property unlike any other piece of real estate in this area. The hospital was situated on approximately 36 acres of land, zoned for institutional purposes, which, although located close to the heart of the City of Wauwatosa and only about five miles from downtown Milwaukee, convenient to public transportation and serviced by

public sanitary sewer and water, was, by reason of its landscaping and topography, isolated from the disturbing elements of city life. Nineteen buildings were located on the hospital grounds,[5] and the plaintiff owned three additional near-by residences.

Both of the defendant's appraisers relied on their own experience and on comparable sales in appraising the plaintiff's property. Mr. Berres appraised the plaintiff's land at $11,500 an acre and Mr. Pfeil appraised the land at $12,000 an acre. Neither was able to point to a comparable sale of land at those prices to an institution, that is, a sale of a land parcel of an area approximating 36 acres to an institution such as the plaintiff which was free to locate in any area. Institutional sales of land relied upon by each as indicative of the value of the plaintiff's land are distinguishable, either because the purchasing institution was required by the nature of its service to locate in a particular area where land values were high, whereas persons interested in an institution such as the plaintiff's would be free to locate in outlying areas where land could be obtained at prices substantially less than $12,000 an acre, or because the parcel sold was only a small fraction of 36 acres.

Nor could either of the defendant's experts point to any comparable sale of land and buildings for institutional purposes. It does not appear that either expert had had any experience selling an institutional property comparable to the plaintiff's.

In estimating the market value of the plaintiff's land and buildings, both Mr. Pfeil and Mr. Berres contemplated that that property would be exposed for sale in the open market for a reasonable time, which, according to Mr. Pfeil, might have been as long as one year and which Mr. Berres thought might be as long as a year and one-half, before a sale at the price they found to be market value

---

5. These buildings may be described generally as an administration building, garage, a gymnasium, dormitories and treatment buildings, and staff homes.

would be consummated. Neither considered whether the plaintiff's business would suffer reverses by reason of such exposure, nor estimated how much the amount realized on the sale would be reduced by such reverses.

The transaction between the plaintiff and the Foundation was in form a sale. Cogent business reasons existed at the time of that transaction to encourage the plaintiff not only to sell its operating assets, but to sell quickly and quietly to the Foundation rather than risk the delays and uncertainties of a very limited market, in which no comparable sales could be examined to furnish a guide to the plaintiff as to whether a greater price was obtainable. We find nothing in the facts to convince us that the transfer was to a "favorite buyer" at less than market value or was in reality a partial gift from the plaintiff to the Foundation. The transfer was in fact what it purported to be, a sale by the plaintiff. We find nothing in the law which requires the seller of property sold at a loss in a true sale to show that fair market value was received from the purchaser. We therefore conclude that the plaintiff is entitled to the loss deduction claimed.

Prior to the trial the defendant also contended that if the sale resulted in a loss, recognition of that loss was prohibited by § 337 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 337, the relevant portions of which provide:

"§ 337. Gain or Loss on Sales or exchanges in connection with certain liquidations

"(a) General rule.—If—

"(1) a corporation adopts a plan of complete liquidation on or after June 22, 1954, and

"(2) within the 12-month period beginning on the date of the adoption of such plan, all of the assets of the corporation are distributed in complete liquidation, less assets retained to meet claims,

then no gain or loss shall be recognized to such corporation from the sale or exchange by it of property within such 12-month period."

There is no question but that a plan of complete liquidation of the plaintiff was adopted after June 22, 1954, pursuant to which the sale here in question was made. In its brief filed prior to trial, the defendant stated its position with respect to the applicability of § 337 as follows:

" * * * The taxpayer's contention is that it retained assets beyond the 12 month period in an amount greater than that needed to meet claims. This is purely a factual matter and its resolution will have to await the proof at trial."

At the trial a supplemental stipulation of facts was filed by the parties which together with the pre-trial stipulation of facts, discloses that on December 31, 1955, more than 12 months after the date of adoption of the plan of liquidation by the plaintiff, the assets retained by the plaintiff, excluding the claim for taxes here in dispute, exceeded the amount required to meet all possible claims. Recognition of the loss resulting from the plaintiff's sale to the Foundation is not therefore prohibited by § 337.

For the above and foregoing reasons, we hold that the plaintiff is entitled to a deduction for the amount of loss resulting to it from the sale of its operating assets to the Ada P. Kradwell Memorial Foundation in 1954 at a price less than its adjusted basis for those operating assets. Pursuant to stipulation, the amount of that loss shall be computed by subtracting from the adjusted basis of the operating assets the amount realized upon the sale of the operating assets.

Plaintiff shall prepare Findings of Fact and Conclusions of Law in accordance with this Opinion, and submit them to counsel for defendant for approval as to form.